| | |
|---|---|
| RASHAD DEBOSE,<br><br>        Plaintiff,<br><br>   v.<br><br>DUN & BRADSTREET HOLDINGS, INC.,<br><br>     Defendant. | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY<br><br>Case No. 2:22-cv-00209-ES-JRA<br><br>Hon. Esther Salas, U.S.D.J.<br>Hon Jose R. Almonte, U.S.M.J. |

---

## PLAINTIFF'S SUPPLEMENTAL BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

POGUST GOODHEAD
James A. Barry
505 S. Lenola Rd. Suite 126
Moorestown, NJ 08057
jbarry@pogustgoodhead.com
Tel: (610) 941-4204

*Additional counsel in signature block*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................ 3

    I.   The D&B Hoovers Product Comprises both Unprotected Non-Speech and Low-Value Non-Expressive Speech that Warrants Only Reduced Protection. ................................... 3

    II.  Because D&B's Advertisements are not Inextricably Intertwined With the Underlying Product, they do not Inherit Whatever First Amendment Protection Applies to D&B's Person-Tracking Services and Searchable Database. ....................................................... 7

    III. Plaintiff's Claims are Subject to Intermediate Scrutiny. ................................... 10

    IV. Plaintiff's Claims Survive Intermediate Scrutiny Because of the Low Value of D&B's Speech and the State's Compelling Interest in Protecting Intellectual Property and Privacy Rights. .......................................................................................................... 12

        A.  Plaintiff's claims survive intermediate scrutiny for commercial speech under *Central Hudson*. ........................................................................................... 13

        B.  Plaintiff's claims would also survive intermediate scrutiny for non-commercial speech under *O'Brien*. ........................................................................................ 18

        C.  Plaintiff's claims would also survive the balancing inquiry many courts apply to perceived conflicts between the right of publicity and First Amendment. ........... 18

    V.  D&B's Advertisements Violate Plaintiff's First Amendment Right Not to Speak on Behalf of a Product He Does Not Support. ................................................................... 20

CONCLUSION ..................................................................................................... 21

## TABLE OF AUTHORITIES

**Cases**

*Ariix, LLC v. NutriSearch Corp*., 985 F.3d 1107 (9th Cir. 2021)........................................ 8, 9, 10

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) ................................................................. 3, 4

*Board of Trustees, State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) ........................................ 8, 15

*Bolger v. Youngs Drug Products Corp*., 463 U.S. 60 (1983) .................................................. 8, 13

*Boshears v. PeopleConnect Inc.*, No. 21-cv-01222,
    2022 WL 888300 (W.D. Wash. Mar. 25, 2022) ................................................................. 11, 15

*Bosley v. Wildwett.*com, 310 F. Supp. 2d 914 (N.D. Ohio 2004) .............................. 16, 17, 18, 22

*Camacho v. Control Group Media Co*., No. 21-cv-1954,
    2022 WL 3093306 (S.D. Cal. July 18, 2022) ................................................................... 11, 20

*Central Hudson Gas Elec. v. Public Serv. Comm'n*, 447 U.S. 557 (1980) ...... 2, 14, 15, 16, 18, 20

*Cher v. Forum International, Ltd*., 692 F.2d 634 (9th Cir. 1982) .................................................. 7

*Comedy III Prods., Inc. v. Gary Saderup, Inc*., 25 Cal.4th 387 (Cal. 2001) ............................... 21

*De Havilland v. FX Networks*, LLC, 21 Cal.App.5th 845 (Cal. Ct. App. 2018) ........................... 7

*Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952 (9th Cir. 2012) ........................................ 6

*Dun & Bradstreet v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) ............. 2, 5, 6, 8, 12, 13, 14

*ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915 (6th Cir. 2003)........................................................ 7

*Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007 (3d Cir. 2008) ....................................................... 9

*Fairfield v. Am. Photocopy Equip. Co*., 138 Cal. App. 2d 82 (1955)........................................... 18

*FilmOn.com Inc. v. DoubleVerify Inc*., 7 Cal.5th 133 (2019).......................................................... 5

*Giboney v. Empire Storage & Ice Co*., 336 U.S. 490 (1949)........................................................... 4

*Groden v. Random House, Inc.,* 61 F.3d 1045 (2d Cir. 1995)........................................................ 7

*Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985) ....................... 22, 23

*Hart v. Elec. Arts, Inc.*, 717 F.3d 141 (3d Cir. 2013) ...................................................... 17, 21, 22

*Hebrew University v. General Motors LLC*, 903 F. Supp. 2d 932 (C.D. Cal. 2012) ................. 18

*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) .............................. 16

*Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509 (7th Cir. 2014)........................................................ 9

*Kellman v. Spokeo, Inc.,* No. 3:21-CV-08976-WHO,
    2022 WL 1157500 (N.D. Cal. Apr. 19, 2022) ........................................................... 10, 18, 19

*Knapke v. PeopleConnect Inc.*, 553 F. Supp. 3d 865 (W.D. Wash. 2021) ................ 11, 15, 16, 18

*Kolebuck-Utz v. Whitepages Inc.*, No. C21-0053-JCC,
    2021 WL 1575219 (W.D. Wash. Apr. 22, 2021)........................................................................ 10

*Krause v. RocketReach, LLC*, 561 F. Supp. 3d 778 (N.D. Ill. 2021).................................... 11, 20

*Lukis v. Whitepages, Inc.*, 542 F. Supp. 3d 831 (N.D. Ill. 2020).................................................. 20

*Martinez v. ZoomInfo Techs. Inc.*, No. 21-cv-5725,
    2022 WL 1078630 (W.D. Wash. Apr. 11, 2022)................................................................. 17, 20

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) .................................................................. 7

*Riley v. National Federation of Blind*, 487 U.S. 781 (1988) ................................................... 8, 10

*Ruffin-Steinback v. dePasse*, 267 F.3d 457 (6th Cir. 2001) ........................................................... 7

*Siegel v. ZoomInfo Techs*, No. 21-cv-2032, 2021 WL 4306148 (N.D. Ill. Sep. 22, 2021)........... 17

*Spindler v. Seamless Contacts, Inc.*, No. 22-cv-787, 2022 WL 16985678 (Oct. 24, 2022) ......... 17

*Trans Union Corp. v. F.T.C*, 245 F.3d 809 (D.C. Cir. 2001) .............................................. 13, 14

*Turner Broadcasting Sys., Inc. v. Fed. Comms. Comm'n*, 520 U.S. 180 (1997) ......................... 20

*United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194 (2003) ................................................... 15

*United States v. Gonzalez*, 905 F.3d 165 (3d Cir. 2018) ............................................................... 4

*United States v. O'Brien*, 391 U.S. 367 (1968)....................................................... 2, 12, 14, 20, 21

*United States v. Sayer*, 748 F.3d 425 (1st Cir. 2014)..................................................................... 4

*United States v. United Foods, Inc.*, 533 U.S. 405 (2001) ......................................................... 22

*Wooley v. Maynard*, 430 U.S. 705 (1977) ...................................................................................... 22

*Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562 (1977) ............................ 16, 21, 22

## PRELIMINARY STATEMENT

On November 23, 2022, the Court issued a text order requesting supplemental briefing regarding the interaction between the First Amendment and Plaintiff's Ohio right of publicity and misappropriation of name or likeness claims. Plaintiff respectfully submits this brief in response to the questions in the Court's text order.

This case arises from Dun & Bradstreet's ("D&B") use of Plaintiff's name and persona to advertise subscriptions to D&B Hoovers, a subscription service that costs $10,000 or more per year. Dkt. No. 1 ("Compl."), at ¶39. D&B advertises D&B Hoovers exclusively to professional salespeople at private companies. *Id.*, at ¶7. Subscribers use the D&B Hoovers product to: (i) identify individuals who might be interested in purchasing the subscribers' product or service; (ii) track those individuals' web browsing, job changes, and other life events in real-time; and (iii) contact those individuals with unsolicited emails and phone calls. *Id*, at ¶¶7, 40.

As relevant to a First Amendment analysis, the D&B Hoovers subscription product comprises two categories of services. First, paying subscribers have access to tools that track targeted individuals' activities in real time (the "person-tracking services"). This first category includes "real-time alerts," which actively alert the subscriber when a targeted individual experiences something that might be an opportune moment for a sales pitch, such as a job change; "personalized buyer intent models," which surreptitiously track targeted individuals' Internet browsing activity to reveal whether they have recently searched for keywords specified by the subscriber;[1] and "dynamically updating lists," which deliver a continuously updating list of

---

[1] D&B's website, which is cited in the Complaint, *see* Compl. at ¶40 n.2, describes "D&B Buyer Intent" as follows: "1. We take your keywords from paid search that align to your campaign objectives. 2. We create a custom model that combs through billions of digital events . . . to pinpoint the accounts that are showing buying activity towards your keywords. 3. We deliver your in-market accounts each week, alongside the strength of the intent signal . . . and the type of content that was engaged with." https://www.dnb.com/products/marketing-sales/buyer-intent-data.html.

individuals who match criteria specified by the subscriber. *Id.*, at ¶40. Second, paying subscribers have access to a searchable database containing profiles about hundreds of millions of individuals and businesses (the "searchable database"). *Id.*, at ¶40. The profiles about individuals contain their names, email addresses, phone numbers, places of work, locations, the identities of their colleagues, and a list of "triggers," which are events in the individual's life that D&B believes "represent selling opportunities." *Id.*, at ¶¶33-34. Some profiles include photographs. *Id.*

D&B's people-tracking services are non-speech and therefore unprotected by the First Amendment. *See* Part I *below*. D&B's searchable database of reports about individuals is speech. But under *Dun & Bradstreet v. Greenmoss*, the searchable database – which does not discuss public issues, contains no transformative or expressive elements, and is distributed solely to professional marketers for the private business purpose of surveilling sales targets – is of low First Amendment value and warrants only reduced constitutional protection. *See* Part I. D&B's commercial advertisements using Plaintiff's name and persona do not inherit whatever First Amendment protection the underlying product has because D&B could easily promote its D&B Hoovers product without reference to Plaintiff's name and persona. *See* Part II. Intermediate scrutiny is the appropriate standard for evaluating D&B's First Amendment challenge to Plaintiff's claims. This is true regardless of whether the advertisements are analyzed as separate commercial speech under *Central Hudson*, as advertisements intertwined with a product containing both speech and non-speech elements under *O'Brien*, or as advertisements intertwined with a speech product of low constitutional value under *Dun & Bradstreet v. Greenmoss*. *See* Part III. Plaintiff's Ohio right of publicity and misappropriation of name or likeness claims easily survive intermediate scrutiny. *See* Part IV. Finally, whatever First Amendment right D&B has to distribute its intrusive and illegal product must be balanced against Plaintiff's First Amendment right not to have his

2

name and persona used to express a commercial message with which he strenuously disagrees. *See* Part V.

## ARGUMENT

**I.    The D&B Hoovers Product Comprises both Unprotected Non-Speech and Low-Value Non-Expressive Speech that Warrants Only Reduced Protection.**

As explained in the preliminary statement, the D&B Hoovers product at issue in this case comprises two categories of services: (i) person-tracking services, and (ii) a searchable database of profiles about individuals. The person-tracking services allow the subscriber to identify specific targeted individuals of interest to the subscriber. D&B will then surreptitiously surveil and track those individual's online activities and information to provide real-time updates about the targeted individuals to the subscriber. *See* Compl., at ¶40; n. 1 *above*. Surveilled activities include job changes and Internet browsing activity. *Id.* For example, D&B will alert a subscriber when a targeted individual or one of his work colleagues enters a search term specified by the subscriber into a web browser. *Id.* As shown in Part IV below, D&B's non-consensual tracking of Internet browsing activities likely violates state and federal wiretap and privacy laws.

D&B's person-tracking services are non-expressive conduct, not speech. In *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Supreme Court acknowledged that statutes regulating the "willfull[] intercepti[ion]" of "wire or oral communication[s]" regulate "conduct," not speech. *Id.* at 523. Therefore, while a third party who was not involved in collecting the information engaged in protected speech when he subsequently published the intercepted information, the surreptitious collection of the information itself was "conduct by a non-law-abiding third party." *Id.* at 530. Here, according to D&B's description of its person-tracking services, D&B does not merely publish information collected by others. Rather, D&B itself actively monitors and intercepts Internet browsing activity and other online information to generate its real-time alerts and

3

personalized buyer-intent models. *See* Compl. at ¶40; n. 1 *above*. Under *Bartnicki*, these activities are conduct, not speech. Accordingly, they are unprotected by the First Amendment.

Nor can D&B plausibly construe its person-tracking services as "speech" merely because D&B reports the result of its real-time tracking to the subscriber. The essence of the advertised service is the tracking, and tracking an individual's activities is non-expressive conduct unprotected by the First Amendment. In *United States v. Sayer*, the First Circuit rejected the argument that the defendant's creation of "online advertisements . . . in Jane Doe's name" was protected speech. 748 F.3d 425, 433-34 (1st Cir. 2014). As the court observed, "it has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* (quoting *Giboney v. Empire Storage & Ice Co*., 336 U.S. 490, 502 (1949)). *See also United States v. Gonzalez*, 905 F.3d 165, 177 (3d Cir. 2018) (online publication of personal information, including "a daily surveillance log tracking [individual's] movements," was not speech protected by the First Amendment). Here, as in *Sayer* and *Gonzalez*, that D&B's provision of person-tracking services necessarily involves communicating the results of its tracking to the subscriber does not shield its intrusive and illegal conduct under the aegis of the First Amendment.

D&B's searchable database containing informational reports about individuals is speech. *See* Compl., at ¶¶32, 34 (displaying screenshots of D&B's reports). But under *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., in which the Supreme Court analyzed similar reports distributed by the same defendant, D&B's informational reports about individuals are speech "of reduced constitutional value" and therefore warrant only "reduced constitutional protection" under the First Amendment. 472 U.S. 749, 756-57 & 761-62, n. 8 (1985). In *Dun & Bradstreet*, the defendant

distributed "report[s]" that "provide[d] subscribers with financial and related information about businesses." *Id.* at 751. The Court observed that "not all speech is of equal First Amendment importance" and that "[i]t is speech on matters of public concern that is at the heart of the First Amendment's protection." *Id.* at 758-59 (internal quotation marks omitted; citation omitted). This is because the First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Id.* at 759 (citation omitted; quotation omitted). In contrast, "[s]peech on matters of purely private concern is of less First Amendment concern." *Id.* Applying these principles to Dun & Bradstreet's reports about businesses, the Supreme Court observed that the reports "concern[] no public issue" and were "speech solely in the individual interest of the speaker and its specific business audience." *Id.* at 761-62. Particularly relevant was the fact that the reports were made available only to paying subscribers, who used the reports solely for private business purposes. *Id.*; *see also FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133, 153 (2019) (rejecting argument that factual reports about businesses "concerned issues of interest to the public" when the defendant provided its reports "not to the wider public . . . but privately, to a coterie of paying clients [who] . . . use the information . . . for their business purposes alone.").

The reports in D&B's searchable database are functionally identical to the reports the Supreme Court analyzed *Dun & Bradstreet*, except that the relevant reports here are about *individuals*, not businesses. Therefore, the connection to any "matters of public concern" is even further attenuated. *See* 472 U.S.at 759. D&B's reports about individuals do not express viewpoints on any topic, are not relevant to any "political and social changes desired by the people," and are distributed solely to a narrow group of paying subscribers. Compl. at ¶¶7, 34-36; *see Dun & Bradstreet*, 472 U.S. at 759. D&B's subscribers are salespeople who use the database to identify

individuals of interest, engage D&B's person-tracking services to surveil them in real-time, and ultimately target them with unsolicited promotions. Compl. at ¶¶7, 19, 40.

D&B may argue that its searchable reports about individuals are more like the yellow pages directory in *Dex Media* than the reports about businesses and individuals in *Dun & Bradstreet*. *See Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952 (9th Cir. 2012). But unlike the yellow pages directory in *Dex Media*, D&B's searchable database is not distributed "free of charge" to the public for the purposes of "identifying businesses that provide a desired service or good" and "learning about . . . the community." *See* 696 F.3d at 954. Rather, the reports in D&B's searchable database are made available only to paying subscribers, who use the reports solely for the private business purpose of making sales calls. D&B's distribution of the searchable database "is solely motivated by the desire for profit which . . . is a force less likely to be deterred than others." *Dun & Bradstreet*, 472 U.S. at 762. As in *Dun & Bradstreet*, "[t]here is simply no credible argument that this type of . . . reporting requires special protection to ensure that debate on public issues [will] be uninhibited, robust, and wide-open." *Id.* (quotation omitted).

D&B's searchable database is nothing like the speech in the cases it cites, each of which involved works that were clearly expressive, political, literary, or transformative in nature. *See* Dkt. No. 29 (D&B reply brief). For example, *New York Times Co. v. Sullivan*, 376 U.S. 254, 256 (1964) involved a full-page advertisement in a newspaper that discussed the conduct of public officials during ongoing civil rights demonstrations. Similarly, *Ruffin-Steinback v. dePasse*, 267 F.3d 457, 459 (6th Cir. 2001) concerned a mini-series depicting the Temptations as recounted in a novel. *Groden v. Random House, Inc.,* 61 F.3d 1045, 1049 (2d Cir. 1995) involved a book about the John F. Kennedy assassination. *ETW Corp. v. Jireh Pub., Inc.,* 332 F.3d 915, 917 (6th Cir. 2003) concerned a painting of "famous figures in sports and famous sports events." *De Havilland*

*v. FX Networks*, LLC, 21 Cal.App.5th 845, 863 (Cal. Ct. App. 2018) concerned a "docudrama about film stars Bette Davis and Joan Crawford"). And *Cher v. Forum International, Ltd*., 692 F.2d 634, 638 (9th Cir. 1982) concerned an interview with famous pop icon. Each of these works contained fully protected speech that lies at the core of what the First Amendment is designed to foster and protect. By contrast, D&B's searchable database contains information about private individuals that professional salespeople use to make sales calls. Under *Dun & Bradstreet*, the searchable database is low-value speech and enjoys only limited First Amendment protection.

## II. Because D&B's Advertisements are not Inextricably Intertwined With the Underlying Product, they do not Inherit Whatever First Amendment Protection Applies to D&B's Person-Tracking Services and Searchable Database.

Commercial advertisements do not inherit the First Amendment protection of the product being advertised, subject to a narrow exception for advertisements that are so "inextricably intertwined" with fully protected speech that the "law of man or of nature makes it impossible to sell" the product without borrowing fully protected speech from the underlying product. *Board of Trustees, State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474 (1989). As the Ninth Circuit wrote in *Ariix, LLC v. NutriSearch Corp*., an otherwise commercial advertisement "can lose its commercial character" only when it is "inextricably intertwined with fully protected speech." 985 F.3d 1107 (9th Cir. 2021) (quoting *Dex Media*, 696 F.3d at 958). The relevant inquiry is not simply whether the commercial advertisement incorporates protected content from the underlying product. Were it so, advertisers could "immunize" otherwise commercial speech "from government regulation simply by including references to public issues." *Bolger v. Youngs Drug Products Corp*., 463 U.S. 60, 68 (1983). Rather, only when product *cannot* be sold without expressing a protected viewpoint will the advertisement inherit the same First Amendment protection as the viewpoint itself. *See Riley v. National Federation of Blind*, 487 U.S. 781, 796 (1988) (solicitations for charitable contributions are inextricably intertwined with "informative and perhaps persuasive speech" about

7

the cause the charity supports) (quotation omitted); *see also Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 521 (7th Cir. 2014) ("the inextricably intertwined doctrine applies only when it is legally or practically impossible for the speaker to separate out the commercial and noncommercial elements of his speech.").

Applying this standard, many courts have found that commercial advertisements like D&B's are not "inextricably intertwined" with the underlying product. This is so even where, like here, the advertisement incorporates a portion or sample of the underlying product, and even where, unlike here, the underlying product is fully protected First Amendment speech, such as a book or video game. The *Ariix* court found that a promotional "ratings section" in a book about nutritional supplements did not enjoy full First Amendment protection because the promotional ratings section was "easily separable" from the adjacent informational sections "describ[ing] the benefits and science of nutritional supplements." 985 F.3d at 1119. This was so even though the promotional ratings section was printed in the same book as the adjacent fully protected speech. *See id.* Similarly, in *Facenda v. N.F.L. Films, Inc.*, the Third Circuit rejected a First Amendment challenge to a false endorsement claim brought by the estate of an NFL broadcaster arising from the publication of a video documentary about the "Madden NFL" video game. 542 F.3d 1007, 1011 (3d Cir. 2008). The court found that a "documentary explaining how the video game was made and depicting the phenomenon of the game's popularity" was commercial speech that did not inherit the First Amendment protection of the underlying game. *Id.* at 1016-18.

Plaintiff's suit challenges D&B's inclusion of the profile representing his name and persona in the free trial D&B uses to promote subscriptions. Compl. at ¶¶9, 11, 38. The free trial profile about Plaintiff includes messages indicating that the free trial user can learn more about Plaintiff, download Plaintiff's information, and track Plaintiff's activities in real-time by

purchasing a paid subscription. *Id.* at ¶¶8-12, 31-40. Clearly, "[n]o law of man or of nature" compels D&B to use Plaintiff's name and persona in this way to sell its D&B Hoovers product. *See Fox*, 492 U.S. at 474. D&B could remove Ohio residents from its free trial. It could limit the free trial database only to individuals who have consented. It could replace its free trial reports about specific individuals with generic "John Doe" reports. Or it could remove the promotional messages linking the purchase of a subscription to the possibility of learning more about Plaintiff. Any of these choices would allow D&B to continue promoting the D&B Hoovers product without violating Plaintiff's intellectual property rights. That it is possible for D&B to promote its searchable database and person-tracking services without reference to Plaintiff's name and persona demonstrates that the two are not inextricably intertwined. Like the ratings section of the book in *Ariix*, and unlike the statements about charitable purpose in *Riley*, D&B could easily stop using Plaintiff's name and persona in its free trial without losing the ability to promote its product.

This conclusion is supported by the fact that many courts have rejected First Amendment challenges to right of publicity claims against websites that, like D&B, use "free trial" or "teaser" access to profiles of personal information to advertise subscriptions to a broader searchable database. *See, e.g.*, *Kolebuck-Utz v. Whitepages Inc*., No. C21-0053-JCC, 2021 WL 1575219, at *2-3 (W.D. Wash. Apr. 22, 2021) (Ohio claims) (use of names and personal information to promote subscriptions to an online directory of personal information is commercial speech and not protected); *Kellman v. Spokeo, Inc.,* No. 3:21-CV-08976-WHO, 2022 WL 1157500, at *14 (N.D. Cal. Apr. 19, 2022) (Ohio claims), *motion to certify appeal denied*, No. 3:21-CV-08976-WHO, 2022 WL 2965399 (N.D. Cal. July 8, 2022) ("the speech is commercial and the laws at issue do not violate the First Amendment"); *Krause v. RocketReach, LLC*, 561 F. Supp. 3d 778, 783 (N.D. Ill. 2021) (rejecting First Amendment challenge in part because "Plaintiff's [right of publicity]

claim does not challenge her inclusion in the defendant's 'directory'"); *Camacho v. Control Group Media Co.*, No. 21-cv-1954, 2022 WL 3093306, at *19 (S.D. Cal. July 18, 2022) (same). Several courts evaluating similar claims have explicitly held that a website's offering of "free trial" or "teaser" access is commercial speech that is not inextricably intertwined with the underlying database, and therefore must be evaluated separately for First Amendment purposes. For example, in *Knapke v. PeopleConnect Inc.*, a website advertised subscriptions by offering free searchable access to low-resolution yearbook photographs, promising that paying subscribers receive access to more and higher-resolution photographs. 553 F. Supp. 3d 865, 871-72 (W.D. Wash. 2021), *rev'd and remanded on other grounds*, 38 F.4th 824 (9th Cir. 2022). Evaluating Ohio right of publicity claims, the court rejected the website's argument that its free access advertisements were "inextricably intertwined" with the underlying subscription product, noting that "the challenged conduct is not the offer of access to yearbooks." *Id.* at 879. *See also Boshears v. PeopleConnect Inc.*, No. 21-cv-01222, 2022 WL 888300, at *10-11 (W.D. Wash. Mar. 25, 2022) (Indiana claims). So too here: Plaintiff does not challenge the inclusion of his report in D&B's searchable database, nor does he challenge D&B's real-time surveillance service that monitors Plaintiff's online activities. Plaintiff challenges only the use of his name and persona in D&B's free trial advertising.

## III.    Plaintiff's Claims are Subject to Intermediate Scrutiny.

As shown in Part II above, D&B's commercial advertisements are not "inextricably intertwined" with the underlying product and therefore do not inherit its protections. But even were this Court to conclude that D&B's advertisements do inherit whatever First Amendment protection the D&B Hoovers product enjoys, the analytical approach would not change: the Court should apply intermediate scrutiny to Plaintiff's claims. As shown in Part I above, D&B uses Plaintiff's name and persona to advertise a product that comprises both speech and non-speech elements: the searchable database is speech of reduced constitutional value, while the person-tracking services

are not speech at all. Under *United States v. O'Brien*, "conduct combining 'speech' and 'non-speech' elements" is "subject to intermediate scrutiny." 391 U.S. 367, 382 (1968). Accordingly, any regulation of the D&B Hoovers product itself – a product that includes a "buyer intent" service which surreptitiously tracks and records targeted individuals' internet browsing activity – is subject to intermediate scrutiny.

Furthermore, even if the D&B Hoovers product did not include non-speech elements – that is, even if D&B used Plaintiff's name and persona solely to advertise its searchable database of information about individuals – intermediate scrutiny would still apply, because the searchable database does not warrant full First Amendment protection. As shown in Part I above, the reports about individuals in D&B's searchable database are like its reports about businesses in *Dun & Bradstreet*. *See id.*, at 750 & 785. They therefore have "reduced constitutional value" and warrant only "reduced constitutional protection." 472 U.S. at 761 & 762 n. 8.

The Supreme Court did not use the language of "intermediate scrutiny" or "strict scrutiny" in *Dun & Bradstreet*. But subsequent opinions applying *Dun & Bradstreet* have made explicit that when a defendant distributes factual information about individuals to private business customers, intermediate scrutiny applies. For example, in *Trans Union Corp. v. F.T.C*, 245 F.3d 809 (D.C. Cir. 2001), the D.C. Circuit held that "information about individual consumers and their credit performance," which was "solely of interest to the [defendant] and its business customers," was "[l]ike the credit report in *Dun & Bradstreet*" and therefore "warrant[s] reduced constitutional protection." *Id.* at 818 (quoting *Dun & Bradstreet,* 472 U.S. at 762 n. 8). The *Trans Union* court rejected the defendant's attempt to apply "strict scrutiny," writing that the defendant "misunderstands our standard of review" and affirming the Commission's application of "intermediate scrutiny" below. *Id.* at 818, 813. Like the reports about individuals in *Trans Union*

11

and the reports about businesses in *Dun & Bradstreet*, D&B's searchable database is distributed only to a narrow group of business customers who use the database for private business purposes. Therefore, even if D&B's advertisements using Plaintiff's name and persona inherited the same First Amendment protection as D&B's searchable database, under *Dun & Bradstreet* and *Trans Union* both the advertisements and database would warrant "reduced constitutional protection" and intermediate scrutiny would still apply.

## IV.  Plaintiff's Claims Survive Intermediate Scrutiny Because of the Low Value of D&B's Speech and the State's Compelling Interest in Protecting Intellectual Property and Privacy Rights.

As shown in Plaintiff's initial opposition to D&B's motion to dismiss, D&B's use of his personal information to advertise subscriptions to its people-tracking service and searchable database is commercial speech under *Bolger*, 463 U.S. at 66; Dkt. No. 18, at *30-33. Therefore, intermediate scrutiny applies. *Bolger*, 463 U.S. at 66; *see also Central Hudson Gas Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 563 (1980) ("The Constitution [] accords a lesser protection to commercial speech"). As shown in Part III above, even if D&B's free trial advertisements inherited the First Amendment protection of the product being advertised, D&B's product contains a mix of speech (the searchable database) and non-speech (the people-tracking services) elements, and therefore intermediate scrutiny again applies. *See O'Brien*, 391 U.S. 367. And even were D&B's product limited to the searchable database, under *Dun & Bradstreet* and *Trans Union*, profiles of information about individuals distributed to paying customers for business use is low-value speech subject to intermediate scrutiny. In short, all roads lead to the same analytical framework: this Court should apply intermediate scrutiny when evaluating D&B's First Amendment challenge to Plaintiff's claims.

**A. Plaintiff's claims survive intermediate scrutiny for commercial speech under *Central Hudson*.**

Under *Central Hudson*, courts analyzing restrictions on commercial speech apply "a four-part analysis." 447 U.S. 557 at 566. First, to qualify for First Amendment protection at all, the speech "must concern lawful activity and not be misleading." *Id.* Second, the court "ask[s] whether the asserted governmental interest is substantial." *Id.* Third, the court "must determine whether the regulation directly advances the governmental interest asserted." *Id.* And fourth, the regulation should be "not more extensive than is necessary to serve that interest." *Id.*; *see also U.S. v. Bell*, 414 F.3d 474, 480 (3d Cir. 2005) (applying *Central Hudson* analysis). With respect to the third and fourth parts of the analysis, the Supreme Court has noted that this "fit" requirement "is not necessarily perfect, but reasonable . . . not necessarily the single best disposition but one whose scope is in proportion to the interest served." *United States v. Am. Library Ass'n, Inc.*, 539 U.S. 194, 218 (2003) (quoting *Fox*, 492 U.S. at 480). In practice, "almost all of the restrictions disallowed under *Central Hudson's* fourth prong have been substantially excessive, disregarding far less restrictive and more precise means." *Fox*, 492 U.S. at 479.

With respect to the first part of the *Central Hudson* analysis, it is doubtful that D&B's use of Plaintiff's name and persona qualifies for any First Amendment protection at all, because, as the *Knapke* court found when analyzing similar advertisements under Ohio law, D&B "misappropriates [Plaintiff's] persona and potentially misleads the public." *Knapke v. PeopleConnect Inc.*, 553 F. Supp. 3d 865, 880 (W.D. Wash. 2021), *rev'd and remanded on other grounds*, 38 F.4th 824 (9th Cir. 2022). In *Knapke*, a website advertised subscriptions by offering free searchable access to low-resolution yearbook photographs, promising that paying subscribers receive access to more and higher-resolution photographs. *Id.* at 871-72; *see also Boshears v. PeopleConnect Inc.*, No. 21-cv-01222, 2022 WL 888300, at *10-11 (W.D. Wash. Mar. 25, 2022)

13

(Indiana claims). Here, D&B's advertisements "potentially mislead[] the public" for the same reason, by falsely suggesting Plaintiff and the Class members' willingly shared their contact information with D&B and approve of D&B's product. *See Knapke*, 553 F. Supp. 3d at 880.

Further, D&B's advertisements fare even worse than the advertisements in *Knapke* and *Boshears* because while those advertisements promoted only a searchable database, D&B's advertisements also promote its people-tracking services. These services include "personalized buyer intent models," which surreptitiously track targeted individuals' Internet browsing activity. *See* Compl. at ¶40; n. 1 *above*. Tracking Internet browsing activity without consent violates state and federal wiretap laws. *See, e.g.*, *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 607-08 & 596 (9th Cir. 2020) (holding that Plaintiffs "sufficiently alleged" Federal Wiretap Act and California CIPA claims based on Facebook's unauthorized tracking and collecting of Internet "browsing histories"). Because D&B's advertisements promote an unlawful service, they "concern unlawful activity" and therefore do not qualify for First Amendment protection at all. *See Central Hudson*, 447 U.S. at 566. Because D&B's advertisements fail the first part of the analysis, Plaintiff's claims survive intermediate scrutiny and the Court need not analyze the issue any further.

Should the Court proceed to the second part of the *Central Hudson* analysis, Plaintiff's right of publicity and misappropriation claims advance "Ohio's substantial interest in enabling its citizens to protect the non-consensual commercial exploitation of their likeness." *Knapke*, 553 F.Supp.3d at 880; *Boshears*, 2022 WL 888300 at *10-11. As the Supreme Court has recognized, a state's interest in protecting the right of publicity "is closely analogous to the goals of patent and copyright law" and prevents "unjust enrichment by the theft of good will." *Zacchini v. Scripps-Howard Broadcasting Co*., 433 U.S. 562, 576 (1977) (analyzing Ohio claims). In *Bosley v.*

*Wildwett.com*, the plaintiff brought an Ohio right of publicity claim against a website that provided free access to her name and photographs as a means of advertising paid subscriptions to the "members only" portion of its website. 310 F. Supp. 2d 914, 914-16 (N.D. Ohio 2004). In finding that the claim survived intermediate scrutiny under *Central Hudson*, the court observed:

> Laws governing the right to publicity have a substantial interest in regulating commercial speech. Individuals have a property right in their own identity. Allowing individuals the exclusive right to capitalize on their persona, like copyright law, encourages them to invest in developing their skills and talents. The right to publicity prevents others from depleting the economic value of one's persona without internalizing the costs. Furthermore, the right to publicity helps prevent deceptive commercial uses.

*Bosley*, 310 F. Supp. 2d at 926. Many courts have recognized that the right of publicity protects an individual's economic right to control and enjoy the benefits of the commercial use of her name and persona. *See, e.g.*, *Hart v. Elec. Arts, Inc.*, 717 F.3d 141, 151 (3d Cir. 2013) ("plaintiffs' names and likenesses belong to them. As such they are property. They are things of value."). Where, as here, a business misappropriates individuals' personas without their consent to advertise subscriptions to a people-search website used by professional salespeople, the state has a substantial interest in redressing that injury. *See, e.g.*, *Spindler v. Seamless Contacts, Inc.*, No. 22-cv-787, 2022 WL 16985678 (Oct. 24, 2022) (denying motion to dismiss California right of publicity claims against defendant with nearly identical business practices to D&B's); *Martinez v. ZoomInfo Techs. Inc.*, No. 21-cv-5725, 2022 WL 1078630 (W.D. Wash. Apr. 11, 2022) (same); *Siegel v. ZoomInfo Techs*, No. 21-cv-2032, 2021 WL 4306148 (N.D. Ill. Sep. 22, 2021) (same).

In addition to protecting from the economic theft of intellectual property, right of publicity laws also serve a state's substantial interest in protecting its citizens from dignitary and emotional harm. "[T]he right of publicity is an intensely personal right meant . . . to protect against personal and dignitary harms, such as having one's persona associated with a product or idea of which he disapproves." *Hebrew University v. General Motors LLC*, 903 F. Supp. 2d 932, 938-39 (C.D. Cal.

2012) (citing Restatement (Third) of Unfair Competition § 46 cmt. c). Misappropriation of a name or likeness impacts "one's own piece of mind" and "may cause suffering much more acute than that caused by a bodily injury." *Fairfield v. Am. Photocopy Equip. Co*., 138 Cal. App. 2d 82, 86–87 (1955) (citations omitted). In *Kellman v. Spokeo*, the court denied a motion to dismiss Ohio right of publicity claims against a website that, like D&B, uses individuals' names and personas to advertise subscriptions, finding that the plaintiffs sufficiently alleged "[defendant's] actions caused them emotional and mental harm." 2022 WL 1157500, at *5.

Here, as in *Kellman*, *Knapke*, and *Bosley*, Plaintiff alleges precisely the economic and dignitary harms the state of Ohio has a substantial interest in preventing. D&B "injured [Plaintiff] by taking his intellectual property without compensation." Compl. at ¶45. D&B also "caused [Plaintiff] mental injury and disturbed his peace of mind" because "[Plaintiff] is deeply uncomfortable" with D&B's "using his name and persona in advertisements for a product" that "enables harassing and unwanted sales and marketing" and which "he has no desire to promote." *Id.* at ¶¶46-48.

With respect to the third and fourth parts of the *Central Hudson* analysis, Ohio's right of publicity law "directly advance[s] [the state's] interest" through means that are "reasonably well-tailored," because the law includes "broad exemptions for matters that are newsworthy, of public interest, or matters of public affairs," which are "the core First Amendment purposes." *Kellman*, 2022 WL 1157500, at *15. As applied in this lawsuit, the relief Plaintiff seeks from D&B "directly advances" the interests Ohio's right of publicity law is designed to protect and does not limit protected speech any more than necessary to achieve those interests. *See Central Hudson*, 447 U.S. at 566; *Fox*, 492 U.S. at 479-80. Plaintiff does not seek to restrain D&B's distribution of the searchable database, nor even does he seek to prevent D&B from surveilling his activities via its

16

people-tracking service. Plaintiff's claim arises solely from D&B's inclusion of the profile representing his name and persona in the free trial D&B uses to promote subscriptions. The free trial profile D&B distributes about Plaintiff includes messages indicating that the free trial user can learn more about Plaintiff, download Plaintiff's information, and track Plaintiff's activities in real-time by purchasing a paid subscription. Compl. at ¶¶8-12, 31-40.

Plaintiff seeks economic compensation for D&B's misappropriation and misuse of his name and persona and an injunction prohibiting D&B from continuing to use his and other Ohio Class members' names and personas in its free trial without consent. Compl. at ¶71. D&B could comply with the law by placing its profiles about Ohio residents behind the pay wall and making them available only to paying customers; or by using generic "John Doe" profiles to promote its product; or by obtaining consent from and providing compensation to any Ohio residents whose profiles D&B wishes to include in its free trial. None of these remedies would preclude D&B from distributing its searchable database and people-tracking service. Whatever First Amendment value the D&B Hoovers database delivers to its subscribers as a source of information, Plaintiff's claim leaves that value untouched. As the court in *Boshears* recognized, that a plaintiff "seeks to stop [the] use of his likeness to advertise [a] subscription service" does not imply that the plaintiff is "attacking [the] dissemination" of the subscription service itself. *See also Lukis v. Whitepages, Inc.*, 542 F. Supp. 3d 831, 752 (N.D. Ill. 2020) (rejecting statutory "public affairs" argument in part because "Defendant[] . . . forgets that Plaintiff's claims are directed towards the free previews, not toward the subscription services advertised by the previews"); *Martinez*, 2022 WL 1078630, at *5 ("while ZoomInfo may operate a database that might concern matters of general interest, its specific use of Martinez's persona at issue in this case is purely commercial"); *Krause*, 561 F. Supp. 3d at 783 (rejecting First Amendment challenge in part because "Plaintiff's [right of

17

publicity] claim does not challenge her inclusion in the defendant's 'directory'); *Camacho*, 2022 WL 3093306, at *19 (same).

In sum, Plaintiff's claims easily survive intermediate scrutiny under *Central Hudson*. Many courts analyzing similar claims under Ohio's and other states' right of publicity laws have reached the same conclusion. There is no reason for a different result here.

### B.   Plaintiff's claims would also survive intermediate scrutiny for non-commercial speech under *O'Brien*.

Should this Court determine that D&B's advertisements must be evaluated not as commercial speech but instead as inheritors of whatever First Amendment protection is due to D&B's people-tracking services and searchable database, then the relevant standard for intermediate scrutiny comes from *O'Brien*. A "regulation will be sustained . . . if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting Sys., Inc. v. Fed. Comms. Comm'n*, 520 U.S. 180, 189 (1997) (quoting *O'Brien*, 391 U.S. 367 at 377). For the same reasons articulated with respect to the *Central Hudson* analysis above, Plaintiff's claim easily survives intermediate scrutiny under *O'Brien*. The economic and dignitary rights protected by Ohio's right of publicity law are unrelated to the suppression of free speech. And as shown above, even if the D&B Hoovers product contained full protected First Amendment speech (it does not), the remedies Plaintiff seeks would not preclude D&B from providing its searchable database and person-tracking services.

### C.   Plaintiff's claims would also survive the balancing inquiry many courts apply to perceived conflicts between the right of publicity and First Amendment.

Many Courts evaluating a perceived conflict between the right of publicity and the First Amendment do not couch their analyses in the language or "intermediate scrutiny." Following the Supreme Court's approach in *Zacchini*, these courts instead apply a "balancing inquiry" that seeks

to "balance the interests underlying the right to free expression against the interests in protecting the right of publicity." *Hart*, 717 F.3d at 149 & 152 (citing *Zacchini*, 433 U.S. at 574–75). Should the Court apply this balancing approach, the result would be the same: Plaintiff's right of publicity claim survives D&B's First Amendment challenge.

Within the balancing inquiry, courts recognize two situations where a defendant's First Amendment rights may outweigh a state's interest in protecting its citizens dignity and intellectual property. First, as the Third Circuit recognized in *Hart*, "works containing significant transformative elements are less likely to interfere with the economic interests implicated by the right of publicity." *Hart*, 717 F.3d at 159 (quoting *Comedy III Prods., Inc. v. Gary Saderup, Inc*., 25 Cal.4th 387, 405 (Cal. 2001)). Here, D&B has done nothing to transform Plaintiff's name and persona. The free trial report simply presents information about Plaintiff and promises that D&B's person-tracking services can deliver additional information about Plaintiff in real time. Second, the right of publicity "does not prohibit the publication of matters of general or public interest, or the use of the name or picture of a person in connection with the publication of legitimate news." *Bosley v. Wildwett.com*, 310 F. Supp. 2d at 920 . This principal is embodied in Ohio's statutory exception for "use . . . in connection with any news, public affairs, [or] sports broadcast." Ohio Rev. Code § 2741.02(D). As Plaintiff demonstrated in his initial opposition, D&B's advertisements do not concern news or public affairs. *See* Dkt. No. 18, at *24-26.  Because this case does not present either of the two situations in which a defendant's First Amendment right to free expression may outweigh the state's interest in protecting the right of publicity, under the balancing inquiry from *Zacchini* and *Hart*, D&B's First Amendment challenge fails.

**V.     D&B's Advertisements Violate Plaintiff's First Amendment Right Not to Speak on Behalf of a Product He Does Not Support.**

Whatever First Amendment right D&B has to advertise its person-tracking service and searchable database must be balanced against Plaintiff's First Amendment right not to have his name and persona misappropriated in service of a commercial message he does not support. The Supreme Court has long recognized that the "freedom of thought and expression" protected by the First Amendment "includes both the right to speak freely and the right to refrain from speaking at all." *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 559-60 (1985) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)). The "freedom not to speak publicly . . . serves the same ultimate end as the freedom of speech in its affirmative aspect." *Id.* (quotation omitted). This First Amendment right not to speak encompasses the right to refuse economic support for viewpoints and messages with which one does not agree. *United States v. United Foods, Inc.*, 533 U.S. 405, 410 (2001) (recognizing that "the First Amendment" protects against "compelling certain individuals to pay subsidies for speech to which they object."). In *United Foods*, the Supreme Court found that the First Amendment protected mushroom growers' right not to fund "advertising" expressing the "message [] that mushrooms are worth consuming whether or not they are branded," because the mushroom growers in questions did not wish to support that message. *Id.* at 411. The Supreme Court has long recognized that intellectual property rights "serve this countervailing First Amendment value." *Harper*, 471 U.S. at 560. Like the exclusive right of copyright discussed in *Harper*, the right of publicity serves an individual's First Amendment right *not* to have her intellectual property misappropriated in support of a message she does not support. *See id.*

Plaintiff does not support or endorse D&B's person-tracking service or searchable database, both of which he believes "encourage[] and enable[] harassing and unwanted sales and

marketing communications" and represent "an alarming invasion of his privacy" and intellectual property rights. Compl., at ¶¶45-48. Nevertheless, D&B co-opted Plaintiff's name and persona without permission to advertise these intrusive products. Under *Harper*, *Wooley*, and *United Foods*, this violates Plaintiff's First Amendment rights.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Dun & Bradstreet's motion to dismiss.

DATED: January 6, 2023                    By:   */s/ James A. Barry*
                                                POGUST GOODHEAD
                                                James A. Barry
                                                505 S. Lenola Rd. Suite 126
                                                Moorestown, NJ 08057
                                                jbarry@pogustgoodhead.com
                                                Tel: (610) 941-4204

                                                Benjamin R. Osborn (*Pro Hac Vice*)
                                                102 Bergen St. Brooklyn, NY 11201
                                                Telephone: (347) 645-0464
                                                Email: ben@benosbornlaw.com

                                                Brittany Resch (*Pro Hac Vice*)
                                                brittanyr@turkestrauss.com
                                                TURKE & STRAUSS LLP
                                                613 Williamson St., Suite 201
                                                Madison, Wisconsin 53703-3515
                                                Telephone: (608) 237-1775
                                                Facsimile: (509) 4423

                                                Michael F. Ram (*Pro Hac Vice*)
                                                mram@forthepeople.com
                                                Marie N. Appel (*Pro Hac Vice*)
                                                mappel@forthepeople.com
                                                MORGAN   &   MORGAN   COMPLEX
                                                LITIGATION GROUP
                                                711 Van Ness Avenue, Suite 500
                                                San Francisco, CA 94102
                                                Telephone: (415) 358-6913
                                                Facsimile: (415) 358-6923

_____
*Attorneys for Plaintiff and the Proposed Class*

22