| | |
|---|---|
| RASHAD DEBOSE, | UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY |
| | Case Action No. 2:22-cv-00209-ES-CLW |
| Plaintiff, | Hon. Esther Salas, U.S.D.J. |
| vs. | Hon. Jose R. Almonte, U.S.M.J. |
| DUN & BRADSTREET HOLDINGS, INC., | |
| Defendant. | |

---

## DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

---

RIKER DANZIG LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

BALLARD SPAHR LLP
1225 17th Street, Suite 2300
Denver, CO 80202-5596
-and-
2029 Century Park East, Suite 1400
Los Angeles, CA 90067-2915

Attorneys for Defendant,
Dun & Bradstreet Holdings, Inc.

Of Counsel:
    Michael R. O'Donnell

On the Brief:
    Michael P. O'Mullan
    Ryan L. O'Neill
    Ashley I. Kissinger (*pro hac vice*)
    Austin W.B. Hilton

## TABLE OF CONTENTS

LEGAL ARGUMENT...................................................................................................2

I.     THE HOOVERS DATABASE IS A SPEECH PRODUCT COMPOSED
       OF EXPRESSIVE CONTENT ENTITLED TO COMPLETE FIRST
       AMENDMENT PROTECTION. ....................................................................2

II.    ADVERTISEMENTS FOR SPEECH PRODUCTS ARE ENTITLED
       TO THE SAME FIRST AMENDMENT PROTECTIONS AS THE
       UNDERLYING SPEECH PRODUCTS THEMSELVES...........................12

       A.     The Supreme Court and other precedent agree that
              advertisements for speech products are entitled to
              the same First Amendment protections as the underlying
              speech products themselves.................................................................12

       B.     Ohio's right of publicity statute expressly protects advertisements
              for speech products protected by the First Amendment...............15

III.   THE HOOVERS FREE TRIAL DEMONSTRATION IS NOT
       COMMERCIAL SPEECH AND, EVEN IF IT COULD REASONABLY
       BE CONSTRUED TO CONTAIN COMMERCIAL SPEECH, THE
       "INEXTRICABLY INTERTWINED" EXCEPTION WOULD APPLY
       AND RENDER IT FULLY PROTECTED SPEECH ...................................16

       A.     The Hoovers free trial is not commercial speech ...........................16

       B.     Even if the Hoovers free trial demonstration is commercial
              speech, the "inextricably intertwined" exception would apply. .....19

IV.    PLAINTIFF'S APPLICATION OF BOTH OHIO'S RIGHT OF
       PUBLICITY STATUTE AND OHIO COMMON LAW CANNOT
       SURVIVE EITHER STRICT OR INTERMEDIATE SCRUTINY. ..........22

CONCLUSION ........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Ad World, Inc. v. Twp. of Doylestown,
  672 F.2d 1136 (3d Cir. 1982) ................................................................ 17

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) .............................................................................. 9

Ariix, LLC v. NutriSearch Corp.,
  985 F.3d 1107 (9th Cir. 2021) ............................................................. 7, 21

Barnes v. Glen Theatre,
  501 U.S. 560 (1991) .............................................................................. 24

Bartnicki v. Vopper,
  532 U.S. 514 (2001) .............................................................................. 10

Bd. of Trs. v. Fox,
  492 U.S. 469, 474 (1989) ...................................................................... 20

Bergen v. Martindale-Hubbell, Inc.,
  285 S.E.2d 6 (Ga. 1981) ....................................................................... 7

Bery v. City of New York,
  97 F.3d 689 (2nd Cir. 1996) ................................................................. 6

Bolger v. Youngs Drug Products Corp.,
  463 U.S. 60 (1983) ............................................................................... 17, 18

Bond v. Solvay Specialty Polymers, USA, LLC,
  583 F. Supp 3d 643 (D.N.J. 2022) ........................................................ 5

Brown v. Entm't Merchs. Ass'n,
  564 U.S. 786 (2011) .............................................................................. 6, 8

Brown v. Showtime Networks, Inc.,
  394 F. Supp. 3d 418 (S.D.N.Y. 2019) .................................................. 14

Buckley v. Valeo,
  424 U.S. 1 (1976) ................................................................................. 11

Carafano v. Metrosplash, Inc.,
   207 F. Supp. 2d 1055, 1074 (C.D. Cal. 2002),
   aff'd on other grounds, 333 F.3d 1119 (9th Cir. 2003)............................................................. 17

Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n,
   447 U.S. 557 (1980)................................................................................................................ 16, 23

Charles v. City of L.A.,
   697 F.3d 1146 (9th Cir. 2012) ............................................................................................... 13

Cher v. Forum Int'l, LTD,
   692 F.2d 634 (9th Cir. 1982) ............................................................................................ 13, 15

Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n,
   149 F.3d 679 (7th Cir. 1998) .................................................................................................. 14

Consol. Edison Co. v. Public Serv. Comm'n,
   447 U.S. 530 (1980).............................................................................................................. 9, 16

D&B v. Greenmoss Builders
   472 U.S. 749 (1985)..................................................................................................................... 8

Daly v. Viacom, Inc.,
   238 F. Supp. 2d 1118 (N.D. Cal. 2002) .................................................................................. 13

Dex Media W., Inc. v. City of Seattle,
   696 F.3d 952 (9th Cir. 2012) ............................................................................................... 7, 16

Exeltis United States, Inc. v. First Databank, Inc.,
   520 F. Supp. 3d 1225 (N.D. Cal. 2021) ................................................................................. 6, 7

Facenda v. NFL Films, Inc.
   542 F.3d 1007 (3d Cir. 2008)............................................................................................... 21, 22

Gorran v. Atkins Nutritionals, Inc.,
   464 F. Supp. 2d 315 (S.D.N.Y. 2006), aff'd, 279 F. App'x 40 (2d Cir. 2008)........................ 17

Guglielmi v. Spelling-Goldberg Prods.,
   603 P.2d 454 (Cal. 1979) ..................................................................................................... 12, 13

Hart v. Elec. Arts, Inc.,
   717 F.3d 141 (3d Cir. 2013)....................................................................................................... 24

Health Sys. Agency of N. Va. v. Va. State Bd. of Med.,
   424 F. Supp. 267 (E.D. Va. 1976) ............................................................................................... 7

Hilton v. Hallmark Cards,
  599 F.3d 894 (9th Cir. 2010) ................................................................... 18

Hunt v. City of L.A.,
  638 F.3d 703 (9th Cir. 2011) ................................................................... 18

Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,
  515 U.S. 557 (1995) ................................................................................. 6

Jordan v. Jewel Food Stores, Inc.,
  743 F.3d 509 (7th Cir. 2014) ................................................................... 20

Joseph Burstyn v. Wilson,
  343 U.S. 495 (1952) ................................................................................. 6

Lane v. Random House,
  985 F. Supp. 141 (D.D.C. 1995) .............................................................. 14

Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,
  138 S. Ct. 1719 (2018) ............................................................................. 24

McPherson v. United States,
  392 F. App'x 938 (3d Cir. 2010) ............................................................... 4

Mills v. Alabama,
  384 U.S. 214 (1966) ................................................................................. 11

N.Y. Times Co. v. Sullivan,
  376 U.S. 254 (1964) ......................................................................... 7, 8, 9, 15

NAACP v. Button,
  371 U.S. 415 (1963) ................................................................................. 8

Namath v. Sports Illustrated,
  371 N.Y.S.2d 10 (1975), aff'd, 352 N.E.2d 584 (N.Y. 1976) ................................. 13

Pacific Gas & Electric Co. v. Public Utilities Comm'n,
  475 U.S. 1 (1986) ..................................................................................... 9

Page v. Something Weird Video,
  960 F. Supp. 1438 (C.D. Cal. 1996) .......................................................... 13

Reed v. Town of Gilbert,
  576 U.S. 155 (2015) ................................................................................. 9

Richmond Newspapers v. Virginia,
    448 U.S. 555 (1980) ................................................................................................ 11

Riley v. Nat'l Fed'n of Blind,
    487 U.S. 781 (1988) ........................................................................................... 19, 20

Rosemont Enters., Inc. v. Random House, Inc.,
    294 N.Y.S.2d 122 (Sup. Ct. 1968) ............................................................................ 7

S.O.C., Inc. v. Cnty. of Clark,
    152 F.3d 1136 (9th Cir. 1998) ................................................................................. 17

Smith v. City of Cumming,
    212 F.3d 1332 (11th Cir. 2000) .............................................................................. 11

Sorrell v. IMS Health, Inc.,
    564 U.S. 552 (2011) ................................................................................................... 6

State ex rel. Petty v. Wurst,
    550 N.E.2d 214 (Ohio Ct. App. 1989) .................................................................... 11

Thompson v. Getty Images (US), Inc.,
    2013 U.S. Dist. LEXIS 91828 (N.D. Ill. July 1, 2013) ............................................ 7

Time, Inc. v. Hill,
    385 U.S. 374 (1967) ................................................................................................... 7

UFO Magazine, Inc. v. Showtime Network, Inc.,
    No. 22-CV-078-NDF, 2022 U.S. Dist. LEXIS 202739 (D. Wyo. Nov. 3, 2022) .... 14

United States ex rel. Geisler v. Walters,
    510 F.2d 887 (3d Cir. 1975) ...................................................................................... 4

United States v. Alvarez,
    567 U.S. 709 (2012) ................................................................................................... 8

United States v. Gonzalez,
    905 F.3d 165 (3d Cir. 2018) .................................................................................... 10

United States v. O'Brien,
    391 U.S. 367 (1968) ................................................................................................. 24

United States v. Sayer,
    748 F.3d 425 (1st Cir. 2014) ................................................................................... 10

United States v. Stevens,
   559 U.S. 460 (2010) .................................................................................. 8

Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.,
   425 U.S. 748 (1976) .................................................................................. 16

Valentine v. Chrestensen,
   316 U.S. 52 (1942) .................................................................................... 16

Vill. of Schaumburg v. Citizens for a Better Env't,
   444 U.S. 620 (1980) .................................................................................. 20

Ward v. Rock Against Racism,
   491 U.S. 781 (1989) .................................................................................. 6

William O'Neil v. Validea.com,
   202 F. Supp. 2d 1113 (C.D. Cal. 2002) ..................................................... 13

**Statutes**

Ohio Rev. Code Ann. § 2741.09 ...................................................................... 15

**Other Authorities**

Restatement (Third) of Unfair Competition ...................................................... 7

On November 23, 2022, the Court requested supplemental briefing on four specific questions spelled out in its text order (the "November 23 Order"). Plaintiff's brief in response dodges the Court's questions, obfuscates the law, and misrepresents the Hoovers database. As set forth below, Plaintiff has not avoided (and cannot avoid) the inescapable conclusion that the Hoovers database, including the free trial demonstration thereof, is entitled to full First Amendment protection.

Defendant Dun & Bradstreet Holdings, Inc. ("D&B") answers the four questions posed by the Court's November 23 Order as follows:

(i)   **"[W]hether the entire 'D&B Hoovers' product at issue in this case including the 'triggers' (D.E. No. [1] at 33) and 'real-time alerts, dynamically updating lists, and personalized buyer intent models' (id. 40) is a speech product[.]"**

Hoovers, including its features and free trial, is a dynamic, comprehensive business database and is a speech product that is as fully protected by the First Amendment. See infra, Point

(ii)   **"[I]f so, whether advertisements for speech products are entitled to the same First Amendment protections as the underlying speech products themselves[.]"**

Advertisements for speech products are entitled to the same First Amendment protections as the underlying speech products themselves. See infra, Point II.

(iii)   **"[I]f not, whether advertisements for products that contain both speech and non-speech components are analyzed as advertisements for speech products or as commercial speech[.]"**

Although the answers to (i) and (ii) are "Yes," even if that were not so, the free trial is not commercial speech because, unlike a traditional advertisement, it is not speech that simply proposes a transaction; it is, rather, a demonstration of the underlying fully protected speech itself. See, infra Point III.

(iv)    **"[W]hether Plaintiff's application of Ohio Rev. Code § 2741 and Ohio common law prohibiting misappropriation of a name or likeness can survive strict or intermediate scrutiny."**

Plaintiff's claims cannot survive strict or intermediate scrutiny. See infra, Point IV.

## LEGAL ARGUMENT

## I.     THE HOOVERS DATABASE IS A SPEECH PRODUCT COMPOSED OF EXPRESSIVE CONTENT ENTITLED TO COMPLETE FIRST AMENDMENT PROTECTION.

Hoovers, a dynamic online database offering users comprehensive business information, is a speech product fully protected under the First Amendment. D&B is a leading global provider of business data and analytics. See D&B 2020 Annual Report at pp. 2, 6-7; (Compl. ¶ 15 n.1.). D&B is most well-known for its credit reporting on businesses, but the product at issue here, Hoovers, is entirely different. The Hoovers database allows business professionals and others to conduct research utilizing continuously updated business information about markets, companies, and employees of those companies. See id.; see also www.dnb.com/products/marketing-sales/dnb-hoovers.html (last accessed January 27, 2023); (Compl. ¶ 40 n.2).

Plaintiff's Complaint acknowledges that Hoovers does not offer Plaintiff's business contact information in isolation but rather as part of this extensive, dynamic database of business information containing "comprehensive intelligence on more than 170 million business records." (Compl. ¶¶ 32, 40). Hoovers offers users "real time alerts, dynamically updated lists and personalized buyer intent models," (id. at ¶ 40 (quoting http://www.dnb.com/ca-en/products/marketing-sales/dnb-hoovers.html)), useful research tools linking corporate news and business analytics in the form of "Triggers," "Corporate Famil[ies]," "Corporate Overviews," "Company Description," and "Products & Markets," along with other features linked to millions of business records, (see id. ¶ 34 (redacted screenshot of Hoovers); ¶ 35 (redacted screenshot of

2

Hoovers).) Company contacts do not stand alone but rather are integrated into, and linked with, the affiliated business profiles, news significant to those businesses, and competitive information about relevant industries. (See id. ¶¶ 34, 35.) This collective body of information is exponentially useful in the business world.

Even the selectively redacted and partial screenshots included in the Complaint demonstrate the useful business information that Hoovers offers about companies and other public and private entities:



(See Compl. ¶ 34 (as modified).) The Complaint nowhere mentions "person-tracking services" nor, as set forth below, does it accurately describe services available to users within Hoovers.

Plaintiff's claim here is that the concededly true information in Hoovers reflecting Plaintiff's municipal title and municipal contact information might be viewed by a free trial subscriber. But there is no legal doctrine that prohibits D&B from publishing this true information, either in the database itself or a free trial demonstration. Plaintiff does not contend that D&B used

Plaintiff's name or business information in, say, an advertisement for sneakers or other merchandise; it merely made his business contact information available to Hoovers free trial users along with thousands of other business contacts. Such cannot possibly be a violation of Ohio's right of publicity laws without radically changing First Amendment jurisprudence. The Hoovers free trial is no different than indisputably lawful free trials to other protected speech such as <u>The New York Times</u> or <u>Encyclopedia Britannica</u>.

Forced to contend with this problem, Plaintiff now pivots from his Complaint using inflammatory descriptions of Hoovers to suggest that Hoovers data is unimportant or even insidious. He attempts to divide the Hoovers database into two categories: "low value" speech concerning purely private interests, and so-called "non-speech" "person-tracking services" that "surreptitiously track targeted individuals' Internet browsing activity." (Pl.'s Supp. Br. at 1.) Indeed, Plaintiff's counsel is on notice, and has failed to rebut, clear evidence of their continued mischaracterizations of Hoovers – including features such as "Triggers" and "Personalized Buyer Intent Models" – in a related action in California, <u>Batis v. Dun & Bradstreet Holdings Inc.</u>, No. 22-cv-01924 (NDC) ("Batis Action").[1]

---

[1] Between the time D&B's motion to dismiss in this case was fully briefed and this Court's November 23, 2022, Order, D&B submitted detailed, specific evidence in the nearly identical Batis Action in connection with a motion to strike under California's anti-SLAPP statute. Plaintiff failed to refute those facts, including that "D&B Hoovers does not provide to its users any information associated with any individual's search or browsing history, whether they were conducting that activity in a work or personal capacity." Hoovers does not publish or collect this information. Batis Action at ECF 25-1 ¶ 8; <u>accord</u> <u>id.</u> ¶¶ 6-8 (describing what "personalized buyer intent models" are). <u>See also</u> <u>id.</u> at ECF 18 ¶¶ 5-11 (describing Hoovers' search features); ¶¶ 22-27 (describing free trial); ¶¶ 16-20 (explaining that "triggers" are alerts a subscriber can set up for themselves). Notwithstanding this unrefuted evidence, Plaintiff persists in attempting to mislead this Court about Hoovers. The Court is entitled to take judicial notice of this information, as our courts "can, and will, take judicial notice of the official record of" other related court proceedings, <u>McPherson v. United States</u>, 392 F. App'x 938, 940 n.1 (3d Cir. 2010), including making "[c]opies of briefs and petitions . . . part of the record before" the reviewing court. <u>United States ex rel. Geisler v. Walters</u>, 510 F.2d 887, 890 n.4 (3d Cir. 1975). While courts will not notice "the veracity and

Plaintiff's mischaracterization of Hoovers as a "purely private matter" of interest only to a limited audience of "salespeople at private companies" and without content about public issues, (see Pl.'s Supp. Br. at 5), is also inaccurate. The Hoovers audience is vast and diverse. Hoovers is used by business professionals, research institutions, universities, libraries, law firms, and government agencies to research and analyze business information. Among other university-subscribers, Georgetown University's website, for example, states that Hoovers is available to "[f]ind up to date proprietary editorial content covering more than 40,000 public and non-public companies and 225,000 key executives." See https://guides.library.georgetown.edu/c.php?g=75556&p=490225. Georgetown also notes that Hoovers is "widely recognized as a leading provider of corporate data." Id. The same is true of public libraries, including the New York Public Library. See https://www.nypl.org/research/collections/articles-databases/hoovers. Even the Library of Congress identifies Hoovers as an important source of company information. See https://guides.loc.gov/company-research/private. The same is true of a wide variety of government agencies, including the Department of Commerce. See https://library.doc.gov/company (describing Hoovers as "one of the best DOC resources to use" for company research thanks to its 120 million records "across over 1000 industries" covering "both domestic and foreign companies and public as well as private firms.").[2]

---

validity of a public document's contents" where "parties dispute the meaning and truth of the [document's] contents," Bond v. Solvay Specialty Polymers, USA, LLC, 583 F. Supp 3d 643, 646 n.4 (D.N.J. 2022), that principle poses no bar here because Plaintiff has never rebutted or contested any of D&B's submissions. Accordingly, judicial notice of these facts is appropriate and warranted. Should the Court disagree, these issues should be resolved promptly at the outset of this litigation with a limited motion for summary judgment.

[2] The Department of Homeland Security has identified Hoovers as a tool to "understand the commercial industry sector." See https://sam.gov/opp/b99432afd0b343f8b1b1e0edf03b7bff/view.

Indisputably, Hoovers content (and the search tools that help subscribers to access it in a customized way) is widely useful and of broad public interest. It falls well within the zone of expressive speech that courts, including the Supreme Court, have held time and again to be First Amendment-protected speech. The Supreme Court reminded us just a decade ago that even speech on basic factual matters that is not the kind of speech one typically reads in the newspaper is still constitutionally protected. See Sorrell v. IMS Health, Inc., 564 U.S. 552, 570 (2011) (holding that factual information about who prescribes drugs was protected speech and observing that "[f]acts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs"). To that end, the definition of speech is broad, being at its root simply the creation or dissemination of information. Id. "The Constitution looks beyond written or spoken words as mediums of expression." Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, 515 U.S. 557, 569 (1995). Indeed, courts have held the First Amendment protects a wide array of activities across a plethora of mediums. See, e.g., id. at 559 (parade organizing); Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989) (music); Joseph Burstyn v. Wilson, 343 U.S. 495, 502 (1952) (films); Brown v. Entm't Merchs. Ass'n, 564 U.S. 786, 790-91 (2011) (video games); Bery v. City of New York, 97 F.3d 689, 695 (2nd Cir. 1996) (visual art); Exeltis United States, Inc. v. First Databank, Inc., 520 F. Supp. 3d 1225, 1234 (N.D. Cal. 2021) (pharmaceutical database). As the Supreme Court has made clear:

> The guarantees for speech and press are not the preserve of political expression or comment upon public affairs, essential as those are to healthy government. One need only pick up any newspaper or magazine to comprehend the vast range of published matter which exposes persons to public view, both private citizens and public officials. The risk of this exposure is an essential incident of life in

---

The U.S. Environmental Protection Agency identifies Hoovers as an example of "Business Publishers/Aggregators." See https://sam.gov/opp/b89cfb9e681105b865d09c8200bede39/view.

> a society which places a primary value on freedom of speech and of
> press.

Time, Inc. v. Hill, 385 U.S. 374, 388 (1967). See also, e.g., Rosemont Enters., Inc. v. Random House, Inc., 294 N.Y.S.2d 122, 125 (Sup. Ct. 1968) (rejecting Howard Hughes' right of publicity interest in an unauthorized biography because publication of biographical material is wholly protected); Restatement (Third) of Unfair Competition § 47 cmt. c ("[T]he right of publicity is not infringed by the dissemination of an unauthorized print or broadcast biography.").

Moreover, speech does not surrender its protection simply because it is sold for a profit. (See D&B's Br. at 15.) Otherwise, any newspaper, magazine, or book for sale would lose its constitutional safeguard. Ariix, LLC v. NutriSearch Corp., 985 F.3d 1107, 1117 (9th Cir. 2021). Thus, courts have appropriately and consistently held that directories and databases of factual information are protected speech. See, e.g., Dex Media W., Inc. v. City of Seattle, 696 F.3d 952, 954 (9th Cir. 2012) (yellow pages fully protected by First Amendment."); Thompson v. Getty Images (US), Inc., 2013 U.S. Dist. LEXIS 91828, at *1 (N.D. Ill. July 1, 2013) (photo licensing website did not use plaintiff's identity for commercial purpose when it provided low-quality sample images in response to user searches, which users could then pay to license); Health Sys. Agency of N. Va. v. Va. State Bd. of Med., 424 F. Supp. 267, 272-73 (E.D. Va. 1976) (publication of physician information, including name and phone number, protected by First Amendment); Bergen v. Martindale-Hubbell, Inc., 285 S.E.2d 6, 6-7 (Ga. 1981) (attorney directory protected by both the First Amendment and Georgia Constitution); Exeltis, 520 F. Supp. 3d at 1234 (N.D. Cal. 2021) (holding pharmaceutical database to be "noncommercial speech as a matter of law.").[3]

---

[3] Beyond these types of popular, useful, and truthful collections of information, of which Hoovers is a prime example, the First Amendment even protects speech that is neither popular, useful, nor truthful. See N.Y. Times Co. v. Sullivan, 376 U.S. 254, 271 (1964) ("[C]onstitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are

Ignoring all of the above, Plaintiff instead seeks to mischaracterize Hoovers in an attempt to relegate it to either information of purely private concern without general interest or "people tracking." To be clear, D&B legally collects information about companies and their contacts listed in the Hoovers database. As demonstrated herein, Plaintiff deliberately misrepresents both Hoovers as a product and how it works, now going so far as to compare Hoovers to something akin to criminal surveillance or wiretapping. (See Pl. Supp. Br. at 3-4.) Plaintiff is wrong and the cases he relies on are easily distinguishable or inapplicable to this case and, indeed, support a finding that Hoovers is protected.

First, Plaintiff's attempt to conflate Hoovers content with "low value" speech of purely private concern, based on D&B v. Greenmoss Builders[4], is factually and legally misplaced. Factually, Greenmoss Builders involved a one-off credit report about a single private business viewed by only five people that was defamatory whereas, here, Plaintiff concedes that his contact data in Hoovers is accurate and sits within millions of other business records in the database. Legally, Greenmoss Builders involved unprotected defamatory speech not subject to either strict or intermediate scrutiny. See United States v. Alvarez, 567 U.S. 709, 717 (2012) (the unprotected categories of speech are defamation, incitement, child pornography, fraud, true threats, "fighting words," obscenity, speech integral to criminal conduct, and other "speech presenting some grave

_____

offered.'" (quoting NAACP v. Button, 371 U.S. 415, 445 (1963))); see also id. at 271-72 (observing that erroneous statements are "inevitable in free debate, and that it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive'" (quoting Button, 371 U.S. at 433)); Brown, 564 U.S. at 796, n.4 ("Crudely violent video games, tawdry TV shows, and cheap novels and magazines are no less forms of speech than The Divine Comedy, and restrictions upon them must survive strict scrutiny[.]"); United States v. Stevens, 559 U.S. 460, 470 (2010) ("The First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits.").

[4] 472 U.S. 749 (1985).

and imminent threat the Government has the power to prevent"). In this case, though, the issue is whether Hoovers content is fully protected or commercial speech, which dictates whether strict or intermediate scrutiny applies to Plaintiff's claims. Thus, Plaintiff's reliance on inapplicable case law involving wholly unprotected speech to argue for a lower level of constitutional scrutiny is forcing a square peg into a round hole.[5]

Simply put, the Supreme Court has never held that nondefamatory, factual speech like that in Hoovers (or the free trial thereof) – in this case business and contact information for employees – is harmful or problematic in society such that a lesser level of constitutional scrutiny is warranted for restrictions on such speech. In fact, quite the opposite. See, e.g., Reed v. Town of Gilbert, 576 U.S. 155, 163-65 (2015) (applying strict scrutiny to sign ordinance regulating signs giving directions to an entity's meetings); id. at 169 ("'[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic.'" (quoting Consol. Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 537 (1980))); Pacific Gas & Electric Co. v. Public Utilities Comm'n, 475 U.S. 1, 8 (1986) (public utility's newsletter that included content ranging "from energy-saving tips to stories about wildlife conservation, and from billing information to recipes," was fully protected speech).

Next, Plaintiff relies on wholly inapplicable wiretapping and criminal cyberstalking cases that are far afield from the actual (or even alleged) facts in this case. For example, Bartnicki v. Vopper involved information illegally obtained in violation of a criminal wiretapping statute. 532

---

[5] Although defamation is unprotected speech, to give the "breathing room" necessary to permit speech and debate on public issues to flourish, the Supreme Court has developed a set of First Amendment-based rules that serve to restrict recovery of defamation awards arising from such speech. See generally Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); New York Times Co. v. Sullivan, 376 U.S. 254 (1964). The issue in Greenmoss Builders was whether the rule restricting awards for presumed and punitive damages applied given the nature of the particular speech at issue there.

U.S. 514, 525 (2001). Here, Plaintiff's Complaint neither pleads a wiretapping statute nor avers that the information in Hoovers was collected in violation of a wiretapping statute, and does not allege facts showing the information was obtained illegally at all. Instead, Plaintiff baselessly alludes to wiretapping for the first time in his brief in a feeble attempt to somehow bring his claims within <u>Bartnicki</u>. But, as demonstrated above, even the publication of information illegally-obtained does not remove First Amendment protection. The <u>Bartnicki</u> Court confirmed this, holding that, despite arguments similar to Plaintiff's trying to recharacterize the speech as "conduct," First Amendment protection still applied. <u>Id.</u> at 527 ("It is true that the delivery of a tape recording might be regarded as conduct, but given that the purpose of such a delivery is to provide the recipient with the text of recorded statements, it is like the delivery of a handbill or a pamphlet, and as such, it is the kind of 'speech' that the First Amendment protects.") So it would be here. As such, <u>Bartnicki</u> provides no help to Plaintiff and, to the extent that it is useful at all in this scenario, actually supports D&B's position.

Plaintiff's reliance on <u>United States v. Sayer</u>, 748 F.3d 425, 427 (1st Cir. 2014), a criminal cyberstalking case, is even more off base. There, the defendant pretended to be his ex-girlfriend, created fake social media profiles and Craigslist ads listing her address for "sexual entertainment," and uploaded sexually explicit videos depicting her to pornographic websites. <u>Id.</u> at 428-29, 429 n.2. As a result, men continuously showed up at her home for five years until the defendant was finally arrested. <u>See id.</u> Such bears no relevance whatsoever to the unchallenged inclusion of Plaintiff's basic business contact information in Hoovers. The conduct in Sayer – on its face – has no relevance to Plaintiff's Complaint and Plaintiff's reliance on a case so far afield speaks to the futility and desperation of his arguments. Likewise, Plaintiff's reliance on the cyberstalking case <u>United States v. Gonzalez</u>, 905 F.3d 165, 177 (3d Cir. 2018) is misplaced for the same reason.

Finally, "[the] First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." Richmond Newspapers v. Virginia, 448 U.S. 555, 575-76 (1980) (quoting First National Bank of Boston v. Bellotti, 435 U.S. 765, 783 (1978)). Paramount among this information is that which is related to public employees such as Plaintiff. See, e.g., Buckley v. Valeo, 424 U.S. 1, 14 (1976) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs[.]" (quoting Mills v. Alabama, 384 U.S. 214, 218 (1966))); Smith v. City of Cumming, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."). The only information about Plaintiff in Hoovers is business information related to his employment as a public employee for the City of Columbus. As such, Plaintiff is asking this Court to restrict the free discussion of information that the State of Ohio recognizes as public information. See State ex rel. Petty v. Wurst, 550 N.E.2d 214, 216 (Ohio Ct. App. 1989) (finding that Ohio county employee's name, classification or job title, salary rate and gross pay is public information not entitled to protection from public disclosure in accordance with R.C. 149.43 and public policy).

In sum, D&B's Hoovers publication as a whole is unquestionably a speech product that is fully protected under the First Amendment. Plaintiff does not dispute that the information in Hoovers is truthful, that it relates to his position as a public employee, or even that D&B has the right to include information about Plaintiff in its Hoovers database; Plaintiff only complains about the display of that same information in free trial demonstrations of Hoovers. For the reasons explained in Points II and III below, that argument, too, fails under the First Amendment.

11

II.    **ADVERTISEMENTS FOR SPEECH PRODUCTS ARE ENTITLED TO THE SAME FIRST AMENDMENT PROTECTIONS AS THE UNDERLYING SPEECH PRODUCTS THEMSELVES.**

Because Hoovers as a whole is a speech product protected by the First Amendment, "advertisements" for Hoovers, including the demonstrative display of information within Hoovers during a free trial user's experience with the product, are likewise entitled to the same protections. Supreme Court precedent, coupled with case law from multiple circuits and states, leaves no doubt that advertisements for speech products are entitled to the same First Amendment protections as the underlying speech products. Indeed, Ohio's right of publicity statute explicitly codifies this protection.

   A.    **The Supreme Court and other precedent agree that advertisements for speech products are entitled to the same First Amendment protections as the underlying speech products themselves.**

As D&B's opening papers explain (and as common sense dictates), advertisements for speech products that draw from the speech products themselves are as protected by the First Amendment as the speech products being advertised. Not surprisingly, most cases addressing this point are brought by celebrities – people who have built up value in their notoriety and are seeking to protect that value – and thus first arose, and most often arise, in California and New York. In Guglielmi v. Spelling-Goldberg Prods., 603 P.2d 454, 457 (Cal. 1979), Chief Justice Bird's concurrence recounted that celebrities enjoy the protection afforded by right of publicity actions because "[a] prominent person has a substantial economic interest in the commercial use of his name and likeness." Nevertheless, she concluded, the use of Hollywood star Rudolph Valentino's name and likeness in a film and, therefore, advertisements for the film, was protected by the First Amendment and, thus, any right of publicity claim arising from the film or ads for it was precluded:

> It would be illogical to allow respondents to exhibit the film but effectively preclude any advance discussion or promotion of their lawful enterprise. Since the use of Valentino's name and likeness in the film was not an

12

> actionable infringement of Valentino's right of publicity, the use of his
> identity in advertisements for the film is similarly not actionable.

Id. at 462 (C.J., Bird, concurring).[6] This sensical proposition is now well-established in California and the Ninth Circuit and applies to all sorts of speech. See, e.g., Cher v. Forum Int'l, LTD, 692 F.2d 634, 639 (9th Cir. 1982) (magazines) ("[c]onstitutional protection extends to the truthful use of a public figure's name and likeness in advertising which is merely an adjunct of the protected publication and promotes only the protected publication."); Page v. Something Weird Video, 960 F. Supp. 1438, 1444 (C.D. Cal. 1996) (home video cassettes) ("Defendants' advertising is protected because the videos themselves are protected by the First Amendment, and the advertising is incidental to the protected publication of the videos."); William O'Neil v. Validea.com, 202 F. Supp. 2d 1113, 1119 (C.D. Cal. 2002) (books) (holding that book on investment strategies and concomitant advertising materials were both entitled to First Amendment protection); Daly v. Viacom, Inc., 238 F. Supp. 2d 1118, 1123 (N.D. Cal. 2002) (television show) ("advertisements of expressive works are not actionable where the advertisements are merely an adjunct of the protected work and promote only the protected work.") (internal quotation marks and alterations omitted).

Around the same time that the California Supreme Court decided Guglielmi, the Court of Appeals of New York reached the same conclusion. See Namath v. Sports Illustrated, 371 N.Y.S.2d 10 (1975), aff'd, 352 N.E.2d 584 (N.Y. 1976) (holding there was no violation of former NFL quarterback Joe Namath's right to publicity when a magazine he had previously appeared in

---

[6] Relying on Guglielmi, the Ninth Circuit has also reiterated that, due to "the need to ensure that First Amendment-protected expression is not unduly chilled by the threat of tort actions that would otherwise prevent the truthful promotion of protected expressive works[,] . . . constitutional protection from tort liability extends to truthful advertisements." Charles v. City of L.A., 697 F.3d 1146, 1153 (9th Cir. 2012).

used a picture of him in an advertisement with the heading "How to get Close to Joe Namath"). And this proposition has consistently been applied not only on the East Coast, as well, but all around the country. See Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n, 149 F.3d 679, 685 (7th Cir. 1998) ("A speaker's publication does not lose its status as protected speech simply because the speaker advertises the publication."); Brown v. Showtime Networks, Inc., 394 F. Supp. 3d 418, 439-40 (S.D.N.Y. 2019) (quoting Cher and Daly to apply the proposition to an advertisement about a documentary film) (internal quotation marks, alterations, and citations omitted); Lane v. Random House, 985 F. Supp. 141, 152 (D.D.C. 1995) (ads summarizing the contents of a book about JFK "cannot be divorced from the book" and were therefore protected under the First Amendment); UFO Magazine, Inc. v. Showtime Network, Inc., No. 22-CV-078-NDF, 2022 U.S. Dist. LEXIS 202739, at *10 (D. Wyo. Nov. 3, 2022) ("The First Amendment protects expressive works, their titles, and advertising identifying the expressive work . . . ."). The result should be no different here where Plaintiff seeks not to prevent his information from being included in Hoovers, but rather to prevent any promotion of D&B's lawful publication by means of a free trial demonstration. If this were not true, First Amendment-protected publications such as newspapers that offer "free trials" of their subscriptions, or place their content behind a partial paywall where a portion of the content is visible, would also violate publicity laws. This cannot be, and obviously is not, the law.

Plaintiff, for his part, dodges this case law entirely by arguing that Hoovers is not protected speech. He seeks to invoke the "inextricably intertwined" test used by some courts to examine hybrid speech containing both commercial and non-commercial elements. This argument fails because, as demonstrated both above and in D&B's moving briefs, Hoovers is fully protected non-commercial speech entitled to the same robust First Amendment protection that applies not only

to books and newspapers, but to directories and databases as well. That case law is equally applicable here. This is so despite Plaintiff's cherry-picking of the case law in a way that suggests only works dealing with noteworthy political movements or famous individuals are worthy of full First Amendment protection. (See Pl.'s Supp. Br. at 6-7 (citing, e.g., Sullivan and Cher, among other cases).) In any event, for the reasons discussed in Point III below, even were this not the case, Plaintiff's "inextricably intertwined" argument still fails.

**B.    Ohio's right of publicity statute expressly protects advertisements for speech products protected by the First Amendment.**

This same bar to Plaintiff's recovery exists in Ohio's right of publicity statute itself, which exempts from its coverage speech protected by the First Amendment. Specifically, Section 2741.09(A)(6) expressly and unequivocally exempts from the statute's coverage "[a] use of the persona of an individual that is protected by the First Amendment to the United States Constitution as long as the use does not convey or reasonably suggest endorsement by the individual whose persona is at issue." Ohio Rev. Code Ann. § 2741.09(A)(6). In addition, Section 2741.09(A)(1)(a)-(d), entitled "constitutional rights and privileges unaffected," makes clear that the statute does not apply to expressive works or their advertisements. Ohio Rev. Code Ann. § 2741.09(A)(1)(a)-(d). D&B's use of Plaintiff's public, business-related contact information in its Hoovers database could not be construed by a reasonable trial user as suggesting in any way that Plaintiff personally endorses Hoovers. In short, both the First Amendment and Ohio law protect the use of persona in an advertisement for a speech product (including a free trial demonstration of a speech product) so long as the use does not convey endorsement. Hoovers does not.

15

III.   **THE HOOVERS FREE TRIAL DEMONSTRATION IS NOT COMMERCIAL SPEECH AND, EVEN IF IT COULD REASONABLY BE CONSTRUED TO CONTAIN COMMERCIAL SPEECH (WHICH IT CANNOT), THE "INEXTRICABLY INTERTWINED" EXCEPTION WOULD APPLY AND RENDER IT FULLY PROTECTED SPEECH.**

A.   **The Hoovers free trial is not commercial speech.**

Commercial speech is entitled to "substantial protection" under the First Amendment and any restrictions imposed on such speech "must survive intermediate scrutiny." Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n, 447 U.S. 557, 564-65 (1980). Commercial speech is speech that does "no more than propose a commercial transaction." Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976) To determine whether speech that bears some characteristics of a traditional advertisement (a proposal for a commercial transaction) amounts to mere commercial speech, courts routinely compare the speech in question to that in Valentine v. Chrestensen, 316 U.S. 52 (1942), the first case to hold that speech was "commercial speech" (and, back then, not entitled to any protection). There, the speech took the form of a handbill advertisement to a submarine exhibition where would-be viewers could see the submarine – itself a non-speech product – for a fee. Id. at 52. Courts hold speech to be non-commercial where the challenged speech conveys, unlike in Valentine, other information beyond just a proposal for a commercial transaction. Courts have held various types of mixed-content speech to be fully protected, non-commercial speech. See, e.g., Dex Media W., Inc., 696 F.3d at 954 ("We conclude that the yellow pages directories qualify for full protection under the First Amendment. Although portions of the directories are obviously commercial in nature, the books contain more than that, and we conclude that the directories are entitled to the full protection of the First Amendment. As a result, when we evaluate the Ordinance under strict scrutiny, it does not survive."); Consol. Edison, 447 U.S. at 534-45 (concluding that a utility company's bill containing statements that might influence consumer decisions was not commercial speech because it concerned the "arena

16

of public discussion"); <u>Ad World, Inc. v. Twp. of Doylestown</u>, 672 F.2d 1136, 1139-40 (3d Cir. 1982) (concluding that a local tabloid containing extensive advertising and a few pages of consumer and community information was not commercial speech because the "publication as a whole" did not "relate[ ] solely to the economic interest of the speaker and its audience"); <u>Gorran v. Atkins Nutritionals, Inc.</u>, 464 F. Supp. 2d 315 (S.D.N.Y. 2006) (holding that a book was not commercial speech despite containing references to products and services), <u>aff'd</u>, 279 F. App'x 40 (2d Cir. 2008); <u>S.O.C., Inc. v. Cnty. of Clark</u>, 152 F.3d 1136, 1144 (9th Cir. 1998) (concluding that a publication with both protected speech and commercial advertisements constituted "noncommercial expressive material").

Moreover, courts have specifically rejected assertions that a free trial of an online publication constituted commercial speech. For example, in <u>Carafano v. Metrosplash, Inc.</u>, 207 F. Supp. 2d 1055, 1074 (C.D. Cal. 2002), <u>aff'd on other grounds</u>, 333 F.3d 1119 (9th Cir. 2003), the defendant Matchmaker.com operated a database containing personal profiles posted by members, <u>id.</u> at 1059, and the plaintiff alleged the profiles constituted commercial speech, <u>id.</u> at 1074. Matchmaker had "trial members" who could use the service for a limited period at no charge, but to continue after the trial period, they had to pay a monthly fee. <u>Id.</u> The court found that "[t]he fact that Matchmaker makes a profit from selling memberships does not transform the speech at issue into commercial speech." <u>Id.</u>

Unlike the above cases, though, courts sometimes consider certain situations too close to call and, for those situations only, the Supreme Court has devised a more detailed test. In <u>Bolger v. Youngs Drug Products Corp.</u>, 463 U.S. 60, 61 (1983), the defendants sent unsolicited mass mailings advertising a non-speech product – contraceptives – via the postal service in violation of federal law. There, even though the underlying product was not speech, and the advertisements

17

were entirely separate from the product itself, the Supreme Court found that the facts "present[ed] a close[] question" as to whether the advertisements were commercial because they were not simply an offer to buy the contraceptives; they communicated information <u>about</u> contraceptives. <u>Id.</u> at 66. Therefore, the Court designed a three-factor test to apply in cases presenting such "close questions." <u>See id.</u> at 66-67. The Court held that "'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation." <u>Hunt v. City of L.A.</u>, 638 F.3d 703, 715 (9th Cir. 2011) (citing <u>Bolger</u>, 463 U.S. at 66-67). Applying the factors, the Court concluded the mailings were commercial speech. <u>Bolger</u>, 463 U.S. at 67.

Unlike <u>Bolger</u>, this case does not pose a "close question" because the Hoovers free trial does far more than merely "propose a commercial transaction." It is not an ordinary "ad" designed to persuade a consumer to buy a non-speech product. Rather, the "product" being sold is a publication protected by the First Amendment, and the free trial of that publication simply provides the free trial user access to the First Amendment-protected content that is contained within it. Rather than being a conventional "advertisement" for a product, the free trial <u>is</u> the product and, thus, cannot be considered commercial speech. <u>See</u> <u>Hilton v. Hallmark Cards</u>, 599 F.3d 894, 905 n.7 (9th Cir. 2010) ("Hallmark's card is not advertising the product; it is the product. It is sold for a profit, but that does not make it commercial speech for First Amendment purposes."). In this sense, Hoovers' free trial demonstration bears even less resemblance to commercial speech than does a news publisher placing articles behind a pay wall that offers either a free trial or a paid subscription to would-be readers in an effort to sell their product. <u>See supra</u> Points I-II.

Likewise, Plaintiff's continued reliance on other recent right of publicity "free trial" cases remains misplaced for the reasons discussed at length in D&B's original brief. (<u>See</u> D&B Br. at

26-29). None of them meaningfully address the cases in Point II.A. And none of them involve publicly available professional information. Here, the information contained in Hoovers is not personal or consumer information but rather business information and, in this case, contact information for a municipal employee. At bottom, the free trial demonstration simply grants a user access to the full business database.

### B.   Even if the Hoovers free trial demonstration is commercial speech, the "inextricably intertwined" exception would apply.

Plaintiff, ignoring the vast majority of the above case law clearly supporting the conclusion that the Hoovers free trial is not commercial speech at all, instead invokes the "inextricably intertwined" test. This test is not used to determine whether speech is commercial but instead whether otherwise commercial speech should nevertheless still be entitled to full rather than reduced First Amendment protection by virtue of it being "inextricably intertwined" with otherwise fully protected speech. See Riley v. Nat'l Fed'n of Blind, 487 U.S. 781, 796 (1988) ("But even assuming, without deciding, that such speech in the abstract is indeed merely 'commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech."). For reasons discussed above in Point II.A, the test is entirely unnecessary here because the Hoovers free trial demonstration is not commercial speech. Nevertheless, even if the content delivered to the free trial user could somehow be transformed into "commercial speech" simply by virtue of who is searching for the information (a free trial user rather than a subscriber), the "inextricably intertwined" exception would nonetheless entitle it to full First Amendment protection.

As the Supreme Court explained in Riley, the "inextricably intertwined" test simply asks if commercial speech "is inextricably intertwined with otherwise fully protected speech." 487 U.S. at 796. If the answer is "yes," the commercial speech no longer retains its "commercial character."

See id. The test does not apply, as Plaintiff claims, "only when product [sic] cannot be sold without expressing a protected viewpoint." (See Pl.'s Supp. Br. at 7.) Rather, it applies wherever it is either "legally or practically impossible for the speaker to separate out the commercial and noncommercial elements of his speech." Jordan v. Jewel Food Stores, Inc., 743 F.3d 509, 521 (7th Cir. 2014). In Riley, for example, it was a "legal impossibility" because the commercial speech was statutorily required to accompany the protected speech. See Bd. of Trs. v. Fox, 492 U.S. 469, 474 (1989) (noting that, in Riley, "the commercial speech (if it was that) was 'inextricably intertwined' because the state law required it to be included").

Even under Plaintiff's interpretation of the test, though, it is hard to imagine how D&B can sell access to its Hoovers database without first allowing prospective subscribers the chance to test the database and its features in a free trial. The Riley Court itself recognized that "[r]egulation of a solicitation 'must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech . . . , and for the reality that without solicitation the flow of such information and advocacy would likely cease." 487 U.S. at 796 (quoting Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 632 (1980)). "Thus, where . . . the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical." Id. Here, there can be no doubt that the Hoovers free trial demonstration meets this criteria. A free trial demonstration of the Hoovers database is wholly inseparable from the underlying non-commercial speech product – the database – because they are one and the same. Plaintiff's information is not used in a separate advertisement for Hoovers, nor is it in some separate section of Hoovers solely dedicated to providing advertisements. Rather, the information – fully protected speech – is in the same place it is for a

20

paying subscriber to Hoovers and, likewise, it is accessed in the same way – via searching for it within the publication.

Completely ignoring this factual reality and problem with his claims, Plaintiff notes that, in applying the "inextricably intertwined" test, "many courts have found that commercial advertisements like D&B's are not 'inextricably intertwined' with the underlying product." (Pl.'s Supp. Br. at 8.) Yet, Plaintiff only cites two cases in support of this proposition and, more incredibly, only one – Ariix, 985 F.3d at 1119 – even engaged in an "inextricably intertwined" analysis at all. And neither case bears any resemblance whatsoever to the Hoovers free trial demonstration.

In Ariix, not only did the nutritional guide at issue in that case consist of two distinct and easily separable sections – a non-commercial section describing "the benefits and science of nutritional supplements" and a commercial section rating nutritional supplements – but also the commercial section was alleged to be fraudulently rigged against the plaintiff. Id. Indeed, it was this last point that led the court to conclude that the speech in question was commercial speech in the first place. See id. at 1115 ("We disagree with the district court's conclusion that the Guide is not commercial speech because the complaint plausibly alleges that the Guide is essentially a sham marketing ploy intended to boost Usana products.").

Facenda v. NFL Films, Inc., in which the court declined to even engage in an "inextricably intertwined" analysis, involved the use of legendary NFL Films narrator John Facenda's voice in a purely promotional video for the then-upcoming video game Madden NFL 06. 542 F.3d 1007, 1012 (3d Cir. 2008). Far from being "'inextricably intertwined' with the underlying product," (Pl.'s Supp. Br. at 8.), the video, a cable-television production titled "The Making of Madden NFL 06," entirely predated the underlying product, airing "eight times in a three-day span leading up to

the release of the video game to retail stores" and "featured a countdown clock to the video game's release." Id. at 1012.

## IV.   PLAINTIFF'S APPLICATION OF BOTH OHIO'S RIGHT OF PUBLICITY STATUTE AND OHIO COMMON LAW CANNOT SURVIVE EITHER STRICT OR INTERMEDIATE SCRUTINY.

For the reasons set forth above, D&B's Hoovers database, including its search and alert features and free trial, is undoubtedly a speech product entitled to full protection under the First Amendment. Further, as demonstrated in D&B's moving papers, right of publicity laws are content-based restrictions on speech because they regulate speech based on the message conveyed. (D&B's Br. at 22-23 (citing cases).) "Content-based laws" such as these are "presumptively unconstitutional" and applications of those laws are subject to strict scrutiny – i.e., they "may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." Reed, 576 U.S. at 163.[7] As in his original brief, Plaintiff, in failing to address the result of applying strict scrutiny to his claims, tacitly acknowledges his claims would not survive. No "compelling interest" could exist to justify the extraordinary restriction of requiring consent before one can publish factual business contact information about a public employee. (See also D&B's Br. at 23-24.)

Instead, Plaintiff doubles down on his mischaracterizations of Hoovers and how it works in a desperate bid to render intermediate scrutiny applicable. But when Plaintiff's mischaracterizations are disregarded, the result is that his claims cannot survive intermediate scrutiny, either. For example, Plaintiff's reliance on Greenmoss Builders and TransUnion is misplaced because, as demonstrated above in Point I, Hoovers is not "distributed only to a narrow

---

[7] D&B does not contend the laws are facially unconstitutional. D&B's challenge is "as applied" – if the Court permitted Plaintiff to recover on the theory of his case, it would violate the First Amendment.

group of business customers who use the database for private business purposes," (see Pl.'s Supp. Br. at 12), but rather is used and recognized by a plethora of entities including multiple U.S. government agencies, universities, and even the Library of Congress.  It can hardly be considered "low-value" speech.

As such, Plaintiff's claims do not survive under the intermediate scrutiny test set forth in Central Hudson. 447 U.S. at 566. As to the first prong, Plaintiff does not claim anywhere in his pleadings that the information in Hoovers is either unlawful or misleading. Nor, as he now claims, is there anything in Hoovers that would reasonably suggest to a free trial user that Plaintiff himself provided his information to Hoovers and approves of the database. In any event, Plaintiff has expressly stated throughout his briefings that he is not challenging the inclusion of the information in Hoovers. Likewise, Plaintiff's claims regarding "people-tracking" and the false suggestion that D&B is somehow violating wiretapping laws are likewise baseless for the reasons stated above in Point I and find no support in Plaintiff's Complaint. Indeed, it is telling of the weakness of his arguments that Plaintiff would, on the one hand, describe Hoovers as "an unlawful service" violating criminal wiretapping and cyberstalking statutes but, on the other hand, acknowledge that he does not challenge his business information appearing in the publication. As to the remaining Central Hudson factors, there is no "reasonable fit" between either Ohio's common law or statutory right of publicity – preventing unauthorized commercial endorsements – and barring D&B's publication of search results in a free trial that identify a public employee's business-related information in its Hoovers database. As set forth in D&B's original brief, Plaintiffs' overbroad construction of the law is not "narrowly drawn" to serve any purported state interest. Thus, even under intermediate scrutiny, the First Amendment bars Plaintiff's claim. In an attempt to convince this Court otherwise, Plaintiff again relies on recent right of publicity decisions that bear no

23

Case 2:22-cv-00209-ES-JRA   Document 61   Filed 01/27/23   Page 31 of 32 PageID: 498

resemblance to the current case for reasons outlined both above at Point III.A and in D&B's original brief.  (See D&B's Br. at 26-29.)

Turning away from the Central Hudson test, Plaintiff's reliance on United States v. O'Brien, 391 U.S. 367 (1968) as an intermediate scrutiny test is misplaced. O'Brien's intermediate scrutiny test does not apply because right of publicity statutes necessarily punish conduct because of its expressive component and O'Brien is only invoked where the government would have punished the conduct regardless of its expressive component. Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n, 138 S. Ct. 1719, 1746 (2018); see, e.g., Barnes v. Glen Theatre, 501 U.S. 560, 566-72 (1991) (applying O'Brien to evaluate the application of a general nudity ban to nude dancing); Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984) (applying O'Brien to evaluate the application of a general camping ban to a demonstration in the park).

Finally, neither Plaintiff's recasting of the intermediate scrutiny test as a "balancing inquiry" nor his invoking of the "transformative use" test in Hart v. Elec. Arts, Inc., 717 F.3d 141 (3d Cir. 2013) invites a different result because, as demonstrated above in Point I, Hoovers is a transformative work. It does not merely publish a static listing of a person's business contact information, or use a person's identity in an advertisement for a product. Rather, it integrates factual information and analysis about businesses and publishes that information dynamically in response to search term queries that organize and link the data in innumerable different ways in response to requests by the subscriber. As such, no matter how one slices the intermediate scrutiny test, Plaintiff's claims still fail.

24

## <u>CONCLUSION</u>

For all of these reasons, and those set forth in D&B's motion to dismiss papers, Plaintiff's claims do not pass constitutional muster and must therefore be dismissed.

Respectfully submitted,

RIKER DANZIG LLP

By: <u>*/s/ Michael R. O'Donnell*</u>
    Michael R. O'Donnell

BALLARD SPAHR LLP
Ashley I. Kissinger (*pro hac vice*)

Attorneys for Defendant,
Dun & Bradstreet Holdings, Inc.

Date:  January 27, 2023